**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Employers Mutual Casualty Company,<br><br>Plaintiff,<br><br>v.<br><br>Ethel B Branch, et al.,<br><br>Defendants. | No. CV-18-08110-PCT-DWL<br><br>**ORDER** |

**INTRODUCTION**

This case involves an attempt by a tribal court to assert jurisdiction over a party that never set foot within the tribe's reservation, never contracted with any tribal members or organizations, and never expressly directed any activity within the reservation's confines.

Employers Mutual Casualty Company ("EMC") is an Iowa-based insurance company. In 2004, EMC sold commercial general liability policies to Service Station Equipment and Sales, Inc ("SSES") and Milam Building Associates, Inc. ("Milam"). Neither company has any tribal affiliation.

While these insurance policies were in place, SSES and Milam were each hired to perform certain work on a gas station in Chinle, Arizona. This gas station was situated on tribally-owned land within the Navajo Nation reservation. In March 2005, an employee of a subcontractor that had been hired by Milam accidentally breached a fuel line. This breach, which went undetected for five months, caused over 15,000 gallons of gasoline to leak into the ground. In response, the Navajo Nation sued an array of parties, including

SSES, Milam, and EMC, in Navajo tribal court. EMC, in turn, moved to dismiss on the ground that it wasn't subject to tribal jurisdiction. After the tribal courts rejected this argument, EMC filed this action in federal court seeking declaratory and injunctive relief.

As explained below, the Court agrees with EMC that it isn't subject to tribal jurisdiction. The Supreme Court has never held that a tribal court has jurisdiction over a non-member, and although the Ninth Circuit has issued several decisions recognizing (or noting the possibility of) such jurisdiction, those cases have almost exclusively involved instances where a non-member was physically present on tribal land and thereafter engaged in the conduct giving rise to liability. Moreover, to the extent the Ninth Circuit has suggested an insurance company may be sued in tribal court despite the absence of any physical presence on tribal land, its decisions have been limited to circumstances where the policyholder was a tribal member and the insurance company engaged in conduct specifically directed toward the reservation. No court has ever recognized tribal jurisdiction under the circumstances presented here, where an insurance company simply sold a policy to a non-tribal member. The Court thus concludes this case doesn't satisfy either of the jurisdictional tests recognized by the Ninth Circuit: (1) EMC isn't subject to jurisdiction under the "right to exclude" test because EMC has never done anything to enter tribal land (and thus can't be excluded), and (2) neither of the exceptions recognized in *Montana v. United States*, 450 U.S. 544 (1981), is applicable.

**BACKGROUND**

A. <u>Underlying Facts</u>

The following facts are derived from the "Stipulated Facts re Subject Matter Jurisdiction As To Claims Against Employers Mutual and Zurich American" that the parties filed during the tribal court proceedings. (Doc. 1-2 at 93-97.)[1]

This case concerns a parcel of land in Chinle, Arizona that is owned by the Navajo

---

[1] EMC has sought to introduce additional facts and evidence not before the Navajo trial court. (Docs. 15-1, 15-2, 15-3, 15-4; *see also* Doc. 15 at 4-5 [discussing separate declaratory judgment and settlement]). The Court declines to consider those facts here. *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 817 n.9 (9th Cir. 2011) (district court erred by considering evidence that wasn't before the tribal trial court).

Nation and located within the Navajo Nation reservation. (*Id.* ¶¶ 1, 5.) In approximately 1955, the Navajo Nation leased the parcel to several tribal members, who thereafter began operating a gas station on the site. (*Id.* ¶ 6.) In 1997, these tribal members entered into a sublease with Pic-N-Run, a company based in Flagstaff, Arizona, to operate the gas station. (*Id.* ¶ 7.)

Until 2004, fuel was stored at the site in three underground storage tanks ("USTs"). (*Id.* ¶ 12.) At some point, Pic-N-Run decided to replace the USTs with above-ground petroleum storage tank systems ("ASTs"). (*Id.*) Pic-N-Run hired SSES and/or another company to assist with the UST-to-AST conversion and separately hired Milam to perform some other renovation work. (*Id.* ¶¶ 11-12.)

At the time they performed this work, both SSES and Milam were covered by commercial general liability policies issued by EMC. (*Id.* ¶¶ 3, 10, 12.) Neither company has any tribal affiliation. SSES is "a non-Indian Arizona corporation whose officer is . . . a non-Indian individual" and Milam is "a non-Indian Texas corporation whose officers are . . . both non-Indians." (*Id.* ¶ 3.) Additionally, EMC is not "a member or member entity of the Navajo Nation," "does not have a contractual relationship with the Navajo Nation," and issued both of the relevant insurance policies from locations (Show Low, Arizona and Flagstaff, Arizona) that are not within the Navajo Nation reservation. (*Id.* ¶¶ 2, 3, 10, 12.)

In March 2005, an employee of a subcontractor that had been hired by Milam accidentally breached a fuel line. (*Id.* ¶¶ 12, 13.) This breach, which went undetected for five months, caused over 15,000 gallons of gasoline to leak into the ground. (*Id.* ¶ 13.) During a subsequent investigation, it was determined that multiple other gasoline leaks had occurred on the site "from the mid-1940s to the mid-1980s and between 1974 and 1978." (*Id.* ¶ 16.)

In August 2009, the United States Environmental Protection Agency issued an administrative order (the "EPA Order") under what's commonly known as the Resource Conservation Recovery Act ("RCRA"). (*Id.* ¶ 17.) The EPA Order was issued against various potentially responsible parties ("PRPs"), including Milam's officers, the tribal

members who had subleased the land to Pic-N-Run, and Pic-N-Run. (*Id.*) SSES was not subject to the EPA Order. (*Id.*) Additionally, no insurance companies were subject to the EPA Order. (*Id.*)

B. Procedural History

In November 2013, the Navajo Nation brought an action in Navajo tribal court to recover monetary damages and "nályééh" arising from the gas leak. (*Id.* ¶ 1; *see also* Doc. 1-2 at 61-80 [tribal court complaint].)[2] The defendants named in the tribal action included, among others, Milam, SES, and EMC. (*Id.*)

In January 2014, EMC filed a motion to dismiss based on a lack of subject matter jurisdiction and standing. (Doc. 1-2 at 82-91.)

In February 2018—more than four years later—the tribal court issued an order denying the motion. (*Id.* at 103-118.)

On March 9, 2018, EMC filed a petition for a writ of prohibition with the Navajo Supreme Court. (*Id.* at 120-139.)

On March 25, 2018, the Navajo Supreme Court issued an order denying the petition. (*Id.* at 141-42.)

On May 25, 2018, EMC filed its complaint in this matter, which seeks declaratory and injunctive relief. (Doc. 1.) Afterward, the parties filed cross-motions for summary judgment. (Docs. 15, 22.)

**DISCUSSION**

I. Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1331 to determine whether the Navajo tribal courts properly asserted jurisdiction over EMC. *Nat'l Farmers Union Ins. Cos. v.*

---

[2] Not included in the parties' statement of stipulated facts, but included in the Navajo Nation's complaint before the tribal court, was that the Navajo Nation's claims against EMC included (1) declaratory relief as to the duty to defend (Doc. 1-2 at 76-77), (2) declaratory relief as to the duty to indemnify (*id.* at 77-78), and (3) nályééh (*id.* at 78-79). Nályééh is a Navajo common law claim under which "holders of the 'money bag'" of those responsible for an injury should resolve the dispute "so there will be no hard feelings." (*Id.* at 79, quoting *Benalli v. First Nat'l Ins. Co. of Am.*, 7 Nav. R. 329, 337-38 (Nav. Sup. Ct. 1998)).

*Crow Tribe of Indians*, 471 U.S. 845, 853 (1985) ("The District Court correctly concluded that a federal court may determine under § 1331 whether a tribal court has exceeded the lawful limits of its jurisdiction.").

Additionally, this case does not present any of the exhaustion/comity issues that are often present in cases addressing questions of tribal jurisdiction. The rule is that "[a] tribal adjudicative body generally must have the first opportunity to evaluate its jurisdiction over a matter pending before it" and that, as a matter of comity, federal courts therefore may entertain unexhausted jurisdiction claims only in certain narrow circumstances. *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 897-98 (9th Cir. 2017). Here, EMC satisfied the exhaustion requirement by unsuccessfully seeking a writ of prohibition from the Navajo Supreme Court after the Navajo trial court denied its motion to dismiss. *Ford Motor Co. v. Todecheene*, 488 F.3d 1215, 1217 (9th Cir. 2007) ("Ford will be deemed to have exhausted its tribal remedies once the Navajo Nation Supreme Court either resolves the jurisdictional issue or denies a petition for discretionary interlocutory review pursuant to Navajo Nation Code tit. 7, § 303 . . . .").

II.  Standard of Review

"The standard of review for an Indian tribal court decision deciding jurisdictional issues is de novo on questions of federal law and clearly erroneous for factual questions. Questions about tribal jurisdiction over non-Indians is an issue of federal law reviewed de novo." *Big Horn Cty. Elec. Co-op., Inc. v. Adams*, 219 F.3d 944, 949 (9th Cir. 2000) (citation omitted). The Ninth Circuit has noted that "the district court's review is akin to appellate review of the tribal court record." *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 817 n.9 (9th Cir. 2011). Thus, the district court cannot rely on evidence that "was not before the tribal court." *Id.*

III.  Analysis

The Ninth Circuit "has long recognized two distinct frameworks for determining whether a tribe has jurisdiction over a case involving a non-tribal-member defendant: (1) the right to exclude, which generally applies to nonmember conduct on tribal land; and (2)

the exceptions articulated in *Montana v. United States*, [450 U.S. 544 (1981)] . . . which generally apply to nonmember conduct on non-tribal land." *Window Rock,* 861 F.3d at 898. Moreover, in *Knighton v. Cedarville Rancheria of N. Paiute Indians*, __ F.3d __, 2019 WL 1145150 (9th Cir. 2019), the Ninth Circuit recently clarified that when, as here, a tribal court seeks to assert jurisdiction over a party based on events that allegedly occurred on tribally-owned land within the reservation, both frameworks are potentially applicable. *Id.* at *8-9. Accordingly, both frameworks are addressed below, even though the Navajo trial court only addressed the latter (the *Montana* exceptions) in its order denying EMC's motion to dismiss.

### 1. **The Right To Exclude**

The Ninth Circuit has explained that the right-to-exclude framework is derived from "the general principle that a tribe's right to exclude non-tribal members from its land imparts regulatory and adjudicative jurisdiction over conduct on that land." *Window Rock,* 861 F.3d at 899. Thus, although the Supreme Court has never held that a tribal court has jurisdiction over a non-member,[3] the Ninth Circuit has issued several decisions recognizing (or noting the possibility of) such jurisdiction in cases where a non-member was physically present on tribal land when engaged in the conduct giving rise to liability. For example:

▪ In *Knighton,* the Ninth Circuit held that a tribal court had jurisdiction to adjudicate embezzlement and other tort claims against a non-member (Knighton), who had contracted with the tribe to serve as tribal administrator, where "most of the claims alleged against Knighton involve[d] conduct that took place on tribal land." 2019 WL 1145150 at *7.

▪ In *Window Rock*, the Ninth Circuit held that tribal jurisdiction was plausible where two non-member school districts had contracted with the tribe to operate schools on tribal land and the challenged conduct occurred on "tribal land over which the Navajo Nation maintains the right to exclude." 861 F.3d at 904.

---

[3] "To this day, the Supreme Court has 'never held that a tribal court has jurisdiction over a nonmember defendant.' This speaks volumes." *Rolling Frito-Lay Sales LP v. Stover,* 2012 WL 252938, *2 (D. Ariz. 2012) (quoting *Nevada v. Hicks,* 533 U.S. 353, 358 n.2 (2001)).

▪ In *Grand Canyon Skywalk Development, LLC v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1196 (9th Cir. 2013), the Ninth Circuit held that tribal jurisdiction over an eminent domain action was plausible where a non-member corporation "cho[]se to do business in Indian country" by entering into a contract with the tribe to construct and operate a tourist attraction on tribal land. *Id.* at 1198-99. In reaching this conclusion, the court noted that tribal jurisdiction was necessary because the contract otherwise "interfered with the [tribe's] ability to exclude [the non-member corporation] from the reservation." *Id.* at 1204.

▪ In *Water Wheel,* the Ninth Circuit similarly found that a tribal court had jurisdiction to adjudicate an unlawful detainer action against a non-member corporation where the corporation had entered into a contract with the tribe to operate a tourist attraction on tribal land and refused to leave after lease expired. 642 F.3d at 805, 816. In reaching this conclusion, the court emphasized that, "through its sovereign authority over tribal land, [the tribe] had power to exclude [the non-members], who were trespassers on the tribe's land and had violated their conditions of entry." *Id.* at 811.

▪ In *McDonald v. Means,* 309 F.3d 530 (9th Cir. 2002), the Ninth Circuit held that a tribal court had jurisdiction to adjudicate tort claims against a non-member who was operating a horse ranch within the reservation and allowed one of his horses to walk onto a tribal highway, causing an accident. *Id.* at 535-36.

The obvious difference between all of those cases and this one is that EMC is not being sued for conduct that occurred while it, or one of its agents, was physically present on the tribal land where the gas station was located. Thus, it's difficult to fathom how the right-to-exclude framework could be construed to confer tribal jurisdiction over a lawsuit against EMC. The theory underlying that framework is that, because a tribe has the sovereign right to exclude non-members from entering its land, the tribe must have the corollary right to adjudicate disputes arising from non-member conduct occurring on its land. Yet here, EMC never set foot on the Navajo Nation's land. Because the tribe couldn't have "excluded" EMC from engaging in the conduct at issue (*i.e.,* selling insurance policies to non-member corporations at off-reservation locations), it follows that the "right to

exclude" framework doesn't supply a valid pathway to tribal jurisdiction.

This outcome is consistent with the handful of cases, cited by Defendants, in which courts suggested it may be possible to sue an insurance company in tribal court despite the absence of any physical presence on tribal land. All but one of those cases involved circumstances where the insurance company contracted directly with a tribal member when selling the policy and thereafter engaged in conduct directed toward the reservation. *See, e.g.*, *Allstate Indemnity Co. v. Stump*, 191 F.3d 1071, 1075 (9th Cir. 1999) (noting that "Allstate sold an automobile insurance policy and mailed monthly premium statements to an Indian resident of the reservation" and that "[a]fter the accident on the reservation, Allstate's agents communicated with the Indians and their counsel"); *State Farm Ins. Cos. v. Turtle Mountain Fleet Farm LLC*, 2014 WL 1883633 (D.N.D. 2014) (same). Here, in contrast, the insurance policies at issue were general liability policies issued to non-Indian corporations, there are no facts suggesting that monthly premium statements were mailed to the reservation, and there are no facts suggesting that EMC's agents communicated with any tribal members after the spill.

The one remaining insurance-company case cited by Defendants—*Admiral Ins. Co. v. Blue Lake Rancheria Tribal Court*, 2012 WL 1144331 (N.D. Cal. 2012)—bears a closer factual resemblance to this case. There, an insurer (Admiral) sold a policy to a non-tribal building contractor, which thereafter accepted an assignment of several employees from a tribal corporation to its jobsites. *Id.* at *1. When those workers got injured, the contractor was sued in tribal court and the contractor filed a cross-claim against Admiral. *Id.* In response, Admiral sought a temporary restraining order in federal court enjoining the exercise of tribal jurisdiction over it. *Id.* at *2-3. Because Admiral hadn't exhausted its tribal remedies, the district court declined to reach the merits of whether Admiral was subject to tribal jurisdiction. Instead, the court denied relief because, among other reasons, "the record [was] not clear as to where exactly [the contractor's] Tribal Court crossclaim against Admiral arose." *Id.* at *5. The court cautioned, however, that it had "some doubts as to the Tribal Court's jurisdiction in this case" and observed that *Allstate* was

- 8 -

distinguishable because Admiral hadn't contracted with any tribal members or directed any of its conduct toward the reservation. *Id.* at \*6.

Although there are portions of the *Admiral* decision that seem favorable to Defendants, it does not, in the final analysis, support their position. The *Admiral* court wasn't tasked with deciding whether tribal jurisdiction existed—due to Admiral's failure to exhaust, the court merely addressed whether the jurisdictional issue presented a "colorable question." Here, EMC has exhausted its tribal remedies, so the jurisdictional issue is squarely presented. Moreover, the *Admiral* court expressed skepticism about whether jurisdiction actually existed and noted that *Allstate* was distinguishable. The Court shares that skepticism and concludes, for the reasons stated above, that it would be improper to construe the "right to exclude" framework as allowing tribal courts to exercise jurisdiction over parties that have never set foot on reservation land, interacted with tribal members, or expressly directed any activity within the reservation's borders.

Finally, Defendants also contend that *Stock West Corp. v. Taylor*, 942 F.2d 655 (9th Cir. 1991), supports their claim that the conduct at issue here took place on tribal land. This argument is unavailing. Although the original three-judge panel's opinion in *Stock West* contained dicta discussing where tribal claims against insurance companies should be said to arise (*id.* at 662), the Ninth Circuit subsequently agreed to rehear the case *en banc* and declined to adopt that portion of the three-judge panel's opinion. *Stock West Corp. v. Taylor*, 964 F.2d 912 (9th Cir. 1992) (en banc); *see also* 9th Cir. R. 35, circuit advisory comm. note to Rules 35-1 to 35-3 ("When the Court votes to rehear a matter en banc . . . [t]he three-judge panel opinion shall not be cited as precedent by or to this Court or any district court of the Ninth Circuit, except to the extent adopted by the en banc court."). Moreover, the two Supreme Court cases discussed in the *Stock West* dicta didn't actually hold that claims against insurance companies arise on the reservation—both cases merely (and narrowly) held that exhaustion was required before challenging a tribal court's jurisdiction in federal court. *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 19 (1987) ("Although petitioner must exhaust available tribal remedies before instituting suit in

federal court, the Blackfeet Tribal Courts' determination of tribal jurisdiction is ultimately subject to review."); *Nat'l Farmers Union,* 471 U.S. at 857 ("Until petitioners have exhausted the remedies available to them in the Tribal Court system, . . . it would be premature for a federal court to consider any relief.").[4]

### 2. **The *Montana* Exceptions**

In *Montana*, the Supreme Court stated that, as a "general proposition," "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." 450 U.S. at 565. However, the Court also noted that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Id.* The Court then identified two exceptions under which tribes may exercise civil jurisdiction over non-members on reservations: (1) "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements"; and (2) "[a] tribe may . . . retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566.

Here, the parties have stipulated the first *Montana* exception is inapplicable. As for the second *Montana* exception, the Court concludes it is inapplicable for two independent reasons. First, EMC did not engage in conduct on the reservation. *Montana*, 450 U.S. at 566 ("A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands *within its reservation* . . . .) (emphasis added); *see also Smith v. Salish Kootenai Coll.*, 434 F.3d 1127, 1131 (9th Cir. 2006) (one of the considerations

---

[4] Defendants also cite *Farmers Ins. Exchange v. Portage La Prairie Mutual Ins. Co.*, 907 F.2d 911 (9th Cir. 1990), for the proposition that "the Nation may generally regulate insurers who allow their insureds on the reservation." (Doc. 22 at 21.) The Court disagrees with this interpretation of *Portage*. That case didn't involve any consideration of tribal jurisdiction issues. Instead, it addressed the separate question of whether an insurance company was subject to the personal jurisdiction of a Montana federal district court because it issued a car insurance policy without any territorial limitations. 907 F.2d at 913-14. The tests for tribal jurisdiction and personal jurisdiction are significantly different.

- 10 -

under *Montana* is whether "the events giving rise to the cause of action occurred within the reservation"); *Allstate Indem. Co.*, 191 F.3d at 1075 (suggesting the second *Montana* exception would be inapplicable if "the claim plainly arose off the reservation"). For the reasons discussed in Part A above concerning the right-to-exclude framework, this requirement isn't satisfied here. EMC didn't enter the reservation, expressly direct any conduct toward the reservation, or engage in any interactions with tribal members. The Court respectfully disagrees with Defendants' argument that selling an insurance policy without a tribal exclusion is tantamount to operating within a reservation.

The second *Montana* exception is also inapplicable because Defendants haven't adequately established that EMC's conduct poses a threat to the tribe's economic security or health and welfare. It bears emphasizing that EMC didn't spill any gasoline or cause any environmental damage here. Instead, EMC is being sued largely as a precautionary measure. For example, the Navajo Nation stated in the complaint filed in tribal court that "[t]he Nation has an actual and justiciable interest in *maximizing insurance funds* . . . and the Nation *could* be required to incur costs . . . if the Policyholder Defendants' insurance does not pay." (Doc. 1-2 at 77, emphases added.) Similarly, the tribal court stated in its order denying EMC's motion to dismiss that EMC was subject to its jurisdiction because "[t]he insurance relationship *may* make EMC responsible for remediating the spill" and "Milam and SSES *may* look to EMC to assist in paying for that cleanup." (*Id.* at 109, emphases added.) And during oral argument on the parties' cross-motions for summary judgment, defense counsel acknowledged that the record is unclear as to whether the Navajo Nation actually requires funding from EMC in order to remediate the damage arising from the gas spill.

In the Court's view, this is too speculative of a basis to conclude the Navajo Nation met its burden of affirmatively establishing that its exertion of "civil authority over the conduct of non-Indians" is necessary because EMC's "conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana*, 450 U.S. at 566. Although the Navajo Nation obviously has a strong and

legitimate interest in protecting the integrity of its land and water supply, the record doesn't establish that EMC's insurance funds are necessary to achieve this objective. For example, the parties have stipulated that the gasoline leaks at the gas station began as early as the 1940s and continued for decades before Milam and SSES did any work at the property. Thus, it's possible that the parties responsible for the earlier leaks will be held responsible for all or most of the remediation costs, not EMC's insureds. Nor does the record establish that Milam and SSES are unable to pay their hypothetical share of the remediation costs in the absence of insurance coverage. Finally, the parties have stipulated that the EPA has already issued an administrative order requiring various parties (not including EMC) to remediate the damage.[5]

In these respects, this case is quite dissimilar from the circumstances in which the Ninth Circuit has found the second *Montana* exception was satisfied. In *Knighton*, the Ninth Circuit emphasized that the non-member's conduct "was of long duration and had a great impact on the Tribe . . . . [For example], Knighton made unreasonably risky investments that led to investment losses in excess of $1.2 million . . . . We conclude that this conduct threatened the Tribe's very subsistence and that the Tribe therefore retains the inherent power under the second *Montana* exception to regulate this conduct." 2019 WL 1145150 at *10. Similarly, in *Grand Canyon Skywalk*, the Ninth Circuit concluded that jurisdiction was plausible under the second *Montana* exception in light of the enormous "potential economic impact" of termination of the contract at issue, which could result in damages as high as $50 million. 715 F.3d at 1206. Defendants have not identified any Ninth Circuit cases where the hope of maximizing insurance funds, or something even similar, was deemed sufficient to meet the second *Montana* exception.

…

…

---

[5] During oral argument, defense counsel persuasively explained that the tribe had a legitimate reason to file suit when it did in 2013—the EPA Order was issued in 2009, yet the cleanup was still in its nascent stages four years later. Nevertheless, the bottom line is that the record doesn't establish whether EMC's funds are necessary, despite the existence of the EPA Order, to cure the tribe's injuries.

Accordingly, **IT IS ORDERED THAT**:

(1) EMC's motion for summary judgment (Doc. 15) is **granted**;

(2) Defendants' motion for summary judgment (Doc. 22) is **denied**;

(3) EMC's request for declaratory and injunctive relief is **granted in part and denied in part**, as follows: The Court declares that the Navajo tribal courts lack jurisdiction over EMC in *Navajo Nation v. Pic-N-Run, Inc., et al.*, Case No. CH-CV-166-13, and any related actions;[6] and

(4) The Clerk of Court shall enter judgment accordingly and terminate this action.

Dated this 3rd day of April, 2019.

                                            Dominic W. Lanza
                                         United States District Judge

---

[6] Although EMC requested more expansive relief, including injunctions barring various individual tribal officials from taking future action, the Court finds such relief unnecessary (and contrary to the notions of comity embedded in the caselaw in this area) in light of the declaratory relief being issued and the statements of counsel during oral argument. If EMC feels that more expansive declaratory and/or injunctive relief is necessary, it may, after consulting with defense counsel, file a motion with the Court.